Curia, per

Johnstoit, Ch.
It has been insisted, in the argument, that the slaves embraced in this settlement had become the absolute property of the husband, jure mariti, upon the marriage; and that, therefore, he had no right to settle them, to the prejudice of his creditors.
It is unnecessary to conclude any thing on this point, there being other considerations, upon which the settlement may, *91 in our opinion, be fully sustained. But I take the occasion to say, that in the actual state of the case I would incline to ( sustain the settlement independently of the other considerations to which I have alluded.
The case at the time of the settlement, was that of a female ward, who had been married in her infancy, and whose property still remained in the custody of the officer specially deputed by the Court to take charge of it, and hold it for her benefit. She was still an infant, at the time of the settlement, and incapable of attending to her property interests. If, under these circumstances, the guardian had declined to settle with the husband, and deliver over to him his wife’s property without a settlement upon her, and had applied to this Court to have a settlement made, I think the experience of the profession in this State must furnish them with proof that his application would have been sustained; and what the Court would have ordered to be done, it will sanction, when done by the parties voluntarily.
It is said that, at law, the title of the slaves vested in the husband, upon the marriage. This may be so. But the question is, whether it vested so as to put it-beyond the control and interference of this Court, acting for the protection of its ward, and in relation to property still in the custody of the trustee, to whose hands the Court had, itself, specially confided it. I do not speak of cases where the property had been surrendered by the trustee ; nor of cases where the ward had attained age; but of the actual case before us, — in which the trustee was still in possession, and holding for an infant, entitled to the protection of the Court by the double claim of being an infant and a married woman. In such a case, I apprehend' the trustee has always been sustained ih an application for a settlement. It seems very difficult to say, in such a case, that because a Court of Law may regard the chattels of the wife in the hands of her guardian as covered by the marital right of her husband; — -that, therefore, a Court of Equity is to disregard the infancy of the wife, and the possession conferred by itself upon the trustee of its own appointment ; or forget that the very object of the Court in taking charge of the infant’s property, and in placing it in the guardian’s hands, was to protect it for her benefit; or that duly estimating the obligation thus assumed, it should shrink from the complete performance of it. Nor am I aware that it has ever done so. Certainly nothing of the sort is to be inferred from the case of Davis v. Rhame, nor from Saussy v. Garden, quoted in argument, where the wife was dead, and a settlement, therefore, out of the question.
But, passing by these considerations, the Court is of opinion that the settlement must stand upon other grounds.
At the time of its execution there was existing against the *92 husband the inconsiderable lien of a judgment for 50 dollars, (held by a creditor who is no party to these proceedings;— and he was also indebted to Duncan, (and to another person who is not a party,) upon demands on which judgments were subsequently obtained.
2 Hill Ch. 558.
Rice Eq. 405.
If, under these circumstance, he had for a valuable consideration and bona fide sold to a stranger the same property which he conveyed to the trustee by way of settlement, it is impossible to say that the sale could have been impeached by Duncan or the other creditor who had not obtained judgment. And, although the lien of the small prior judgment might have followed the property, or its holder might have been relieved against the conveyance, if he had applied for relief; yet no other creditor, not standing in his circumstances, is entitled to claim the advantage of his lien, there being no intentional fraud in the case. In such a case, the discharge of the lien would free the transaction of all imputation; and it is not perceived how other parties, not defrauded, nor intended to be defrauded, could impeach the transaction, in the name of one who does not choose to complain; or have a remedy greater in extent than that to which, if complaining, he would have been entitled. The doctrine we are now discussing has no relation, whatever, to voluntary conveyances, which are voidable generally by any existing creditor; but it is intended to be applied exclusively to conveyances for valuable consideration and made in good faith. And such conveyances are liable only to pre-existing liens.
This was a case, however, in which the alienation was not made to a stranger, nor did the consideration proceed from a stranger. The conveyance was made to a trustee selected by the guardian, and the consideration was money in the hands of the guardian, and which he paid over to the husband on condition that he would make it.
This money was not subject to the marital right of the husband. Although due to the wife, it was still a chose in action, resulting from the accountability of the guardian. If the husband had called upon this Court, as he must have done, for an account, undoubtedly the guardian, or any other friend of the wife, might have interposed for a settlement. The evidence is, that, when called on, the guardian did insist on a settlement.
The case, then, is as if the guardian holding the wife’s money, and entitled to have it settled, had purchased the property which was settled, with the money. It is, in principle, pre-the case of Banks v. Brown, in which it was held that a purchase of the husband’s property by the wife out of her own property, if made bona fide, was entitled tobe supported. It is entirely unlike the case of Bank v. Mitchell, quoted in argument, in which it appears that nothing “ was said about *93 the settlement when the money was paid.” It stands upon a principle well established, and recognized, among other cases,, in the Union Bank v. Toomer.
Hill Ch. 27.
Of the bona fides of this settlement there is not a particle of doubt. The evidence shews that it was made without reference to creditors, and without the least intention to defraud them; but solely upon the ground that the trustee would not! part with the money unless a settlement was made. The only objection, then, that can be urged against it, is, that the money was not equivalent to the property settled. This objection can only apply to the slaves; for the land was the undoubted property of the wife. Regarding the slaves as belonging to the husband, as contended for, it does not appear that they greatly exceeded in value the price paid for them. There were 13 of them, of whom 7 were children. What were their qualities we do not know. The sum paid was near 3,000 dollars. It is not pretended that there was the semblance of such inadequacy as infers a fraudulent intent. But as Chancellor Harper observes in the Bank v. Mitchell, “ if there is any consideration, then the question is of bona fides, or of actual fraudulent intention;” and the Chancellor, upon the evidence in this case, tells us that no fraud was intended ; for, says he, “there can be no doubt of the propriety of the motives of all the parties to the settlement,” “ the terms of which appear to be reasonable and just.”
It is ordered and decreed that the bill in the first case (that of J. J. Ryan, adm’r. of Duncan,) be dismissed; and that in the second case (that of D. F. Jamieson, trustee, v. Geo. D. Keitt, sheriff,) an injunction do issue perpetually enjoining the defendant from proceeding to enforce the execution referred to in the pleadings in that case.
Dunkin, Ch. concurred.
Dargan, Ch. absent at the hearing.

Bill dismissed in the first case, and decree reformed in the second.